### Slocumb *v.* The State.

Atkinson, J. 1. The omission of the judge to instruct the jury as to the law of impeachment of witnesses by contradictory statements does not require the grant of a new trial, in the absence of an appropriate and timely written request for an instruction on the subject. *Long* v. *State,* 127 *Ga.* 350 (4) (56 S. E. 444); *Lewis* v. *State,* 125 *Ga.* 48 (53 S. E. 816); *Stiles* v. *State,* 154 *Ga.* 86 (2) (113 S. E. 208).

2. The charge of the court applied the doctrine of reasonable fears as embodied in the Penal Code (1910), § 71, and the omission to charge the exact language of that provision of the code was not erroneous.

3. The judge charged the law of voluntary manslaughter as contained in section 65 of the Penal Code, but did not charge the law of voluntary

manslaughter as related to the doctrine of mutual combat; and it was not error to fail to charge upon this subject, as mutual combat was not involved under the evidence. RUSSELL, C. J., and ATKINSON, J., dissent from the ruling of the majority in this headnote; their views on this subject being as follows: On the trial of a defendant charged with murder, where there is evidence authorizing the jury to conclude that at the time of the homicide the accused and the person killed were engaged in mutual combat, it is the duty of the judge, with or without a request, to charge the law of voluntary manslaughter as related to the doctrine of mutual combat, and his failure to so charge the jury will require the grant of a new trial. *Buchanan* v. *State,* 153 *Ga.* 866 (113 S. E. 87); *Ison* v. *State,* 154 *Ga.* 408 (114 S. E. 351), and cases cited.

(a) Mutual combat exists where there is a fight and both parties are willing to fight. *Tate* v. *State,* 46 *Ga.* 148; *Ison* v. *State,* supra.

(b) Though conflicting, there was evidence tending to show the following facts: The defendant and the deceased had a quarrel at the Ocmulgee Park, and separated. A few hours later they met in front of Cody's Ice-Cream Parlor. The deceased with certain companions arrived a few moments before the defendant. When the defendant arrived he "seemed to be very angry," and approached the deceased and his companions. The deceased asked the defendant "why he threw the brick at him," and the defendant made no answer. The deceased arose from where he was sitting, and "grabbed" the defendant in his shirt. The defendant "snatched aloose" from the deceased, and "pulled a pistol from his bosom" and shot the deceased, inflicting the mortal wound from which he died. The deceased had no weapon when the shooting occurred. They were each about 18 years of age. This evidence was sufficient to show mutual intention to fight, executed by the parties engaging in combat.

4. The failure upon the part of the court to charge section 73 of the Penal Code, which declares, that "If a person kill another in his defense, it must appear that the danger was so urgent and pressing at the time of the killing, that, in order to save his own life, the killing of the other was absolutely necessary; and it must appear, also, that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given," was not hurtful to the accused. While this section is applicable in cases of mutual combat, it was clearly not hurtful to the defendant to omit giving it as a part of the instructions in this case.

5. The defendant's attorney stated to the court and jury on the trial, "that the State . . showed a case of voluntary manslaughter, or made no greater case than voluntary manslaughter." After such statement the judge did not err in charging the jury: "Now, in this case, one of the contentions of the defendant is that he cannot be guilty of any greater offense than voluntary manslaughter."

6. Provocation by opprobrious words or abusive language alone will not reduce an unlawful homicide from murder to voluntary manslaughter. Penal Code (1910), § 65; *Fargerson* v. *State,* 128 *Ga.* 27 (57 S. E. 101). The charge complained of in the sixth ground of the motion for a new trial is not erroneous for the reason stated.

7. The court did not err in charging: "But if the provocation given by [the deceased] to the defendant and the only provocation given him was

to advance and place his hand upon his collar, and you believe that conduct was justified, and that was the only conduct of the deceased, then that conduct of [the deceased] would not avail the defendant for the purpose of reducing the killing from murder to voluntary manslaughter." *Lingo v. State*, 29 *Ga.* 470; *Thompson v. State*, 55 *Ga.* 47; *Mathews v. State*, 125 *Ga.* 50 (54 S. E. 196).

8. The judge was requested to charge: "The burden is on the State to prove malice; unless the State proves malice, then there can be no verdict of guilty of murder, for there can be no murder without malice, and it would be your duty to acquit the defendant." The substance of this request was sufficiently stated in the charge as given, and the refusal to instruct the jury in the exact language of the request is not cause for a reversal.

9. With reference to the law of self-defense the judge charged: "It must appear that . . [the deceased] was seeking to inflict upon the defendant a felonious assault, or was doing something that gave him reasonable ground to believe that . . his life was in danger. He could not be entitled . . to a verdict of not guilty, . . unless it appeared that he acted in self-defense at a time when either his life was in danger, or he had reasonable ground to so believe, at the hands of [the deceased], or that he was in danger of having inflicted upon him by [the deceased] a felonious assault. It would [not?] be a felonious assault for [the deceased] to merely strike the defendant with his hands, or any degree of violence of that sort; it must be an assault that would itself be a felony, such as assault with a pistol or knife, or some other assault of that sort that would amount to a felony on the part of" the deceased. This charge was not erroneous on the grounds: (*a*) That it denied the right of self-defense. (*b*) It restricted the defense to an assault with a pistol or knife. (*c*) That it was for the jury to say what demonstration of violence will be sufficient to justify a homicide.

*Judgment affirmed. All the Justices concur, except Russell, C. J., and Atkinson, J., dissenting.*

No. 3712. December 19, 1923. Rehearing denied January 19, 1924.

Murder. Before Judge Mathews. Bibb superior court. March 16, 1923.

Jake Slocumb was charged with the crime of murder by shooting Harrison Goodrum with a pistol and causing his death. The jury returned a verdict finding the defendant guilty, and recommending him to the mercy of the court. The exception is to the judgment refusing the defendant's motion for a new trial. The evidence shows that the tragedy occurred late Sunday afternoon, in front of Cody's Ice-Cream Parlor in the village of Tindallfield near the City of Macon, in Bibb County. The defendant fled, and after two years was arrested in New Jersey and brought back for trial. Guy Goodrum, brother of Harrison Goodrum, the deceased,

testified as follows. Slocumb and Harrison had had a difficulty earlier in the evening at a near-by park, which witness did not see. Witness was present at the second difficulty, the one that resulted in the homicide. Others present in front of the store besides Harrison were John Fountain, Ottis Horton, and J. L. Holt, while Robert Lamar was in the store. Harrison was seated on a bench, and the others were standing. Jake Slocumb approached to within about seven feet of the party, coming up from Elizabeth Street, and stopped by a China tree. "He leaned against the tree, with his hand in his right front pocket. My brother stood up just the time he saw Jake. My brother says, 'Jake, you threw a brick at me,' and Jake says, 'Yes —— it, I throwed it,' and Jake then out and went to shooting with a 38 pistol; he got the pistol out of his right front pocket. He shot twice. My brother never put his hands on Jake. My brother had no weapons of any kind, and made no effort to hurt Jake, . . but tried to reach Jake's gun before it fired, but did not get his hand on it. The first shot hit my brother in the right hand about the palm, the bullet going in on the inside, and the next shot hit him about the middle of the chest." On cross-examination the witness testified. "Horton and Fountain were sworn before the coroner's jury. All of them were under 21 years old at the time of the shooting. My brother and the defendant had an argument down at the Park before they came there. I was not present at that time, but I saw the last difficulty. My brother did not start towards the defendant. I did not testify before the coroner's jury he advanced upon him. . . I testified before the coroner's jury: . . 'I was sitting in front of Cody's Ice-Cream Parlor in Tindallfield, with my brother, Harrison Goodrum, Johnnie Fountain, and Odis [Ottis?] Horton, when Jake Slocumb came up and leaned against a chinaberry tree about three feet from where we [were?] sitting, and my brother said to Jake, 'You throwed a bottle at me,' and Jake said, 'Yes, I threw the bottle at you.' I did not say, 'My brother got up and started towards Jake.' I did say, 'Jake then drew the gun from his right front pants pocket and shot my brother twice.' I reckon my mind was fresher two years ago when I testified than it is now. I did not testify before the coroner that Jake ran and my brother followed him. I did swear, 'Jake ran off, and my brother went back to the ice-cream parlor.' I did not hear Fountain's

testimony before the coroner's jury. I am about 19 years old now. I don't know what the fuss started about. They had a fuss at the park before the shooting. My brother might have been mad with Jake about throwing the bottle at him. When my brother got after Jake about throwing at him he stood right where he was; he didn't move."

Robert Lamar testified: "Harrison walked up there just a minute before Jake got there. Jake came around the front part, and Harrison walked about 25 feet from the place, and Jake caught up with him, but I didn't hear any words; but when Jake walked up there I heard the report of the gun, and I hollored at Jake, and he broke and run, and Harrison walked back with both hands up, and says, 'Lord, he has killed me.' . . I was about 25 feet from them; it was a 50-foot lot, and they were about the middle of it. I did not hear them say anything. I did not see any scuffle or scrambling before the shooting." On cross-examination the witness testified: "I don't know what happened at the park. I have stated all I know. Neither of them seemed to be mad when they came up there. I did not hear Harrison ask Jake if he threw a bottle at him. I was sitting down out there talking with all the boys. I cannot recall the names of all the boys there, but I was talking to Johnnie Fountain. There were several boys there. . . I did not hear them say a word. I did not see Harrison grab Jake in his shirt. . . Harrison did not follow Jake a step. . . At the time of the shooting it was 'Cody's Ice-Cream Parlor.' Harrison was sitting on a bench, but when he saw Jake coming he got up and walked to the middle of the lot, and after he was shot he came back and sat down on the bench and fell off of it."

The defendant made a statement before the jury, in substance as follows: Defendant and Harrison with three others formed a party that went from the city on a street-car to the park. While there the others drank whisky, and Harrison assaulted defendant and cut him on the arm with a razor. The party returned, and after leaving the street-car Harrison twice more assaulted defendant and threatened to kill him. Defendant remained a short time at his home, and then went to "Cody's." When he got there Harrison again assaulted and chased him, cutting him in the arm, when he shot in self-defense to save himself. "The first shot was made in front of his door, and the next shot was in the vacant

lot, he was chasing me so." The defendant then introduced the testimony of Johnnie Fountain, taken before the coroner's jury, the witness having since died, which included the following: "I was sitting on a bench in front of Cody's Ice-Cream parlor, . . with Harrison Goodrum, talking to him, when Jake Slocumb came up and stood by the post about 3 feet from us. Harrison asked Jake why he threw the brick at him, and Jake made no answer· Harrison then got up from where he was sitting, grabbed Jake in his shirt. Jake snatched aloose from Harrison, pulled a pistol from his bosom, and shot Harrison; the first shot hit him in the hand, the second shot hit him [his?] breast. Jake then ran off. Harrison walked about 10 feet and said, 'Boys, that got me,' and sat down on the bench. Jake seemed to be very angry when he came up. I heard that Jake' and Harrison had had some trouble at Ocmulgee Park a few hours before they met in ·Tindallfield. I don't know of my own knowledge anything of this trouble. Harrison had no weapon when the shooting occurred; both boys were about 18 years old."

The defendant also introduced the evidence of Guy Goodrum, taken before the coroner's jury, which included the following: "I was sitting in front of Cody's Ice-Cream parlor, . . with my brother, Harrison Goodrum, Johnnie Fountain, and Odis Horton. . . My brother said to Jake, 'You throwed a bottle at me, didn't you?' and Jake said, 'Yes, I threw a bottle at you.' My brother then got up and started towards Jake. Jake then drew a gun from his right front pants pocket and shot my brother twice; the first shot hit him in the left hand and the second shot in the breast; after my brother was shot in the hand he made at Jake and ran about 10 feet, when Jake turned and shot the second time. Jake than ran off, and my brother went back to the ice-cream parlor and laid down. I don't know anything of the trouble at Ocmulgee Park. My brother had no weapon at the time of the shooting."

*John R. Cooper* and *W. O. Cooper Jr.,* for plaintiff in error.

*George M. Napier, attorney-general, Charles H. Garrett, solicitor-general,* and *Seward M. Smith, asst. atty.-gen.,* contra.